UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANDREA PAIGE CARTER COHEN          )
                                   )
                Plaintiff,         )
                                   )     CIVIL ACTION NO.
                                   )     12-11130-DPW
          v.                       )
                                   )
ELEPHANT ROCK BEACH CLUB, INC.     )
                                   )
                Defendant.         )


MEMORANDUM AND ORDER
December 3, 2014

This action arises out of an injury suffered by the
plaintiff, Andrea Paige Carter Cohen, when she jumped off a
natural rock formation in the Atlantic Ocean known as Elephant
Rock during a visit to the Elephant Rock Beach Club (the "Beach
Club") in Westport, Massachusetts, on July 6, 2009.  The
plaintiff seeks damages for the alleged negligence of the Beach
Club.  Before me is the Beach Club's motion for summary judgment
and the plaintiff's motion to strike the supplemental report of
the Beach Club's expert, on which the Beach Club relies in
support of its summary judgment motion.  For the reasons set
forth below, after denying the motion to strike, I will deny the
motion for summary judgment.

## I. BACKGROUND

### A.  *Factual Background*

#### 1.  The Property

The defendant, Elephant Rock Beach Club, Inc., operates a
private beach club in Westport, Massachusetts accessible to
members and their paid guests.  The Beach Club leases the land
on which it sits from Westport Harbor Improvement Corporation
("WHIC").  This lease provides the Beach Club with exclusive
control over the leased land, including the beach along the
property.

The beach is along a body of water known as Westport
Harbor, which leads to the Atlantic Ocean near the opening to
Buzzards Bay.  The water sheet itself is not part of WHIC's
property and therefore not part of the lease.  As a consequence,
the Beach Club has no right to restrict access to the water, and
individuals who are not members or guests of the club can and do
arrive by boat and swim in the water adjacent to the Beach Club
without accessing the beach itself.

Approximately 250 feet off the shore of the beach (measured
at low tide) is Elephant Rock (the "rock"), a natural rock
formation.  According to Beach Club's expert, the rock is not
located on the land owned by WHIC and leased by the Beach Club;
rather, title is vested with the Commonwealth of Massachusetts

because portions of the rock are beyond the mean low tide, not to mention the lowest predicted yearly tide level (the "extreme low tide" line).  The rock is also located beyond the buoys at the end of safety ropes the Beach Club has installed. Individuals who are not members or guests of the Beach Club arriving by boat can and do access the rock.

The stated purpose of the Beach Club is "[t]o establish and maintain places for social meetings, encouraging athletic exercises, yachting, swimming and healthful recreation," and to "promot[e] the civic improvement of that part of the Town of Westport."[1]  Guests at the Beach Club engage in "typical beachfront activities," including swimming in the Atlantic Ocean, sunbathing, socializing, playing sports, and building sandcastles.

In addition, guests commonly swim to, around and jump off the rock.  Depending on the tide level, the drop from the top of the rock to the water is between eight and twelve feet. Although the rock has different elevations, guests typically jump from the highest part.  In order to clear the submerged

_____

[1] Annual membership fees are $175 per person or $250 per family, and members may bring guests for an additional fee.  The term "guests" as well as the term "visitors" will be used at times in this memorandum to describe both members and guests of members who are using the club.

portion of the rock, a jumper must get a running start, plant her foot in the right location, and jump out.

## 2. Safety Precautions

The parties agree that the Beach Club employed four practices that can fairly be characterized as safety precautions related to swimming, including swimming near the rock:  safety ropes, a flag system, lifeguards, and signage.

*a. Safety Ropes.*  The Beach Club maintains three safety ropes that are fifty to eighty yards apart in the water (east, middle, and west).  Each rope is approximately seventy yards long with a buoy at the end to hold it in place.  There is no single safety rope stretching entirely east to west at the buoys.  The rock is located approximately twenty to twenty-five feet beyond (i.e., further from the shore than) the buoys at the end of the safety ropes.

The Beach Club appears to contend that the safety ropes are not in place to limit the swimming area for guests, that guests commonly swim past the safety ropes and are not prevented from doing so by the lifeguards.[2]  Indeed, there are no signs advising

---

[2] The Beach Club states that the safety ropes are in place to aid the lifeguards in maintaining the safety of guests while they are in the marked swimming area.  However, the testimony the Beach Club cites to support this proposition indicates that the safety lines exist to enable guests to swim laps and enable lifeguards to take a headcount more easily.

guests to swim only within the ropes.  The lifeguards primarily monitor the area within the ropes, but they view the wider expanse of the beach and ocean, including the area around the rock.

  *b.  Flag System*.  The Beach Club also operates a flag system signaling water safety and swimming conditions.  A green flag signals good swimming due to relatively calm water, low waves, and high visibility.  A yellow flag advises caution due to rough surf, fog, undertow or subsurface changes resulting from sand shift following rip currents.  The plaintiff asserts that a yellow flag also means that lifeguards will restrict guests' use of the water (e.g., by limiting access to a certain distance); by contrast, the Beach Club contends that it could not restrain anyone from swimming but can merely advise caution.  A black flag signals high surf or rip currents.  The plaintiff asserts that a black flag means that swimming around and using the rock was prohibited; the Beach Club contends that the black flag alerts swimmers that the conditions for swimming to the rock are unsafe and that doing so is at one's own risk.

  *c.  Lifeguards*.  When a black flag is raised, lifeguards have whistled in swimmers who were on or near the rock.  When a green flag is raised, at least one lifeguard would not whistle in guests who swam to and jumped off the rock.

*d. Signage.* The Beach Club asserts that a sign accompanying the black flag, "rock closed," is merely shorthand for the true meaning of the flag: that swimming to or around the rock would be dangerous and unadvised. It appears that the black flag serves as a warning, but that the club could not prohibit anyone from swimming out to the rock.

In addition, the Beach Club has three signs located in different parts of the property stating that use of the rock is at one's own risk, that children under the age of eight are not allowed on the rock, and that children eight to nine years old must be accompanied by an adult.

### 3. The Plaintiff's Visit

On July 6, 2009, the plaintiff, a thirty-nine year old woman, went to the Beach Club as a guest of a member. She had never been to the Beach Club or jumped off the rock before. She says that she did not see any signage at the club that day.

On the day of her visit, the green flag was raised, and there were six lifeguards on duty. While she sat on the beach, the plaintiff watched many others go back and forth to, and jump from, the rock. Eventually, the plaintiff decided that she wanted to go to the rock, and did so by walking from the beach to the water and swimming to the rock. The plaintiff states that at the highest point of the rock, she could see the water

below but not through it, and could not determine the conditions
below the surface.   After watching adults and children take a
running start and jump off the highest part, the plaintiff
waited her turn in line and did the same.   The parties agree
that at the time the plaintiff jumped, she did not think that
jumping from the rock was dangerous.

The plaintiff alleges that after she jumped, her foot
smashed into a portion of the rock below the surface of the
water.[3]   The lifeguards on duty noticed the plaintiff after she
hit the water and went to assist her.   As a result of the
incident, the plaintiff suffered a compound fracture of her leg.

**B.    *Procedural History***

The plaintiff filed the underlying complaint on June 26,
2012, alleging negligence based on premises liability and a duty
to warn.    The Beach Club filed a motion for summary judgment on
September 30, 2014.   In response to my inquiry, on October 15,
the Commonwealth of Massachusetts filed a notice of appearance
as an interested party.   After docketing a letter explaining why
it has no legal responsibility in the matter and was choosing

---

[3] The Beach Club asserts that the specific mechanics of injury
are disputed, because the plaintiff has also stated that the
injury occurred as a result of her leg becoming stuck between
two rocks, as indicated in the emergency room report following
her injury.

not to be a party to this case, the Commonwealth appeared at the hearing on summary judgment only as an observer.

## II. PLAINTIFF'S MOTION TO STRIKE
## THE SUPPLEMENTAL EXPERT REPORT

### A.    Background

I set a fact discovery completion deadline of October 1, 2013, an expert disclosure deadline for the plaintiffs of November 1, and the same for the Beach Club of December 2. Under the initial discovery deadlines, expert depositions were to be completed by February 3, 2014.  In May, 2014, the parties let the schedule slide.  They informed me by way of a joint status report that the Beach Club had not yet disclosed its experts, but that it had agreed to provide these disclosures by July 1, a deadline I later entered as an order at a June status conference.  The parties also agreed that expert depositions would be completed on or before August 15, 2014.

On July 1, the Beach Club provided an expert disclosure for Donald Medeiros.  That disclosure contained Medeiros's opinion that title to the rock is vested with the Commonwealth because the rock is located in an area below the low tide mark. Although plaintiff's counsel noticed the deposition of Medeiros, she decided not to pursue this deposition and alerted defense counsel of that decision on July 24.

On August 12, the Beach Club's counsel provided the plaintiff with a supplemental expert report, dated July 22, 2014. This report contained Medeiros's opinion that title to the rock was vested with the Commonwealth because the rock is located in an area below the level of the lowest predicted yearly tide, also known as the "extreme low tide" line. This opinion was based on observations Medeiros made on July 12 at the Beach Club and additional background information provided along with the report. On August 12, the date on which the plaintiff received the supplemental report and three days before the parties' agreed upon expert deposition deadline, the plaintiff filed a motion to strike the supplemental report. The Beach Club opposes the motion to strike, noting that the plaintiff did not contact defense counsel or attempt to resolve the issue before filing the motion, contrary to the requirements of Local Rules 7.1(a)(2) and 37.1(a).

**B.    *Legal Standard***

Fed. R. Civ. P. 26(a)(2) requires that a written expert report be submitted in a timely manner in accordance with the discovery schedule set by the court. Under Fed. R. Civ. P. 37(c)(1), failure to comply with the disclosure requirements of Rule 26(a) can result in a sanction – a prohibition on the use of testimony stemming from an untimely expert disclosure, for

example – "unless the failure was substantially justified or is harmless." See *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 62 (1st Cir. 2011) (stating that "[t]ogether Rules 26 and 37 operate to 'prevent the unfair tactical advantage that can be gained by failing to unveil an expert in a timely fashion,'" and noting that a judge has broad discretion in determining whether, and if so which, sanctions are appropriate based on considerations of fairness and justification) (quoting *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004)).

## C.   *Analysis*

The plaintiff seeks to strike Medeiros's supplemental expert report because it was not provided by the expert disclosure deadline.  She contends that the preparation of the supplemental report and the delay in service of the supplement on the plaintiff until three days before the deposition deadline was intentional; that the untimely disclosure was not substantially justified, as there were opportunities for extreme low tide observations prior to July 12; and that it is not harmless, because she would be highly prejudiced by the use of the supplemental information at trial without having had the opportunity to have Medeiros's opinions reviewed by her own expert or to depose Medeiros.

The Beach Club asserts that the delayed supplemental disclosure was substantially justified and indeed required by Fed. R. Civ. P. 26(e) (requiring party to supplement expert report where party "learns that in some material respect the disclosure . . . is incomplete"), because Medeiros became aware of precedent suggesting that the extreme low tide mark might denote the property boundary only after he completed his initial report. Because the first extreme low tide date following this discovery was July 12, the Beach Club contends that the delay was justified.[4]

As a preliminary observation, I note, as more fully developed in the next section, that the opinion provided in the supplemental report does not appear to be of any consequence to the outcome of this case. In *Spillane* v. *Adams*, 922 N.E.2d 803, 806, 810-13 (Mass. App. Ct. 2010), the Massachusetts Appeals Court defined the boundary line for waterfront properties as the "mean low water mark in accordance with the National Geodetic Vertical Datum (NGVD) Standards." In so doing, the court indicated an intent to create a usable, objective standard that would allow boundary determinations to be made "with relative

---

[4] The Beach Club's counsel attributes the delay between the July 22 date of the supplemental report and the August 12 date of its service on the plaintiff to "summertime vacations."

ease."[5]  *Id.* at 811-13.  The Appeals Court observed that the use

of the *extreme* low water line as a boundary measure had been

rejected by the Supreme Judicial Court in *Rockwood* v. *Snow Inn*

*Corp.*, 566 N.E.2d 608, 613 (Mass. 1991).  *See Spillane*, 922

N.E.2d at 811-12; *see also Pazolt* v. *Director of Div. of Marine*

*Fisheries*, 631 N.E.2d 547, 550 n.8 (Mass. 1994) (noting that

Supreme Judicial Court left open in *Rockwood* the proper water

mark measure).

Given the state of the law, Medeiros's initial expert

report, which appears to describe the mean low tide mark as the

boundary measure, would be sufficient to place the rock beyond

the property line of the Beach Club.  Testimony consistent with

Medeiros's supplemental expert report would be unnecessary under

the current legal standard.  As a result, the untimely

disclosure appears harmless.  Further, even if the supplemental

disclosure were material, the plaintiff has not demonstrated why

an extension of time to have Medeiros deposed and his report

_____

[5] The Supreme Judicial Court has not taken up the question since
*Spillane*, nor has it cited to the case since its publication.
However, in *Arno* v. *Commonwealth*, 931 N.E.2d 1, 13 (Mass. 2010),
a case released five months after *Spillane*, the Supreme Judicial
Court stated that "[g]reater public rights exist in submerged
lands, the land lying seaward of the low water mark."  This,
combined with the fact that the Supreme Judicial Court denied a
request for further appellate review of the *Spillane* decision,
suggests that the state's highest court does not disagree with
the holding in *Spillane*.

reviewed would not remedy the alleged prejudice.[6]  Accordingly,

to the degree the parties choose to pursue the issues,[7] I will

deny the motion to strike, but will permit the plaintiff to

depose Medeiros at the cost of the Beach Club if she so chooses.

### III. THE BEACH CLUB'S MOTION FOR SUMMARY JUDGMENT

The plaintiff's complaint essentially pleads two theories

of negligence: that the Beach Club breached a duty of care to

maintain the rock, as its premises, in a reasonably safe

condition, and that the Beach Club breached a duty to warn the

plaintiff of known hazards involving the rock.  The Beach Club

contends in its motion for summary judgment that the plaintiff

can prove no set of facts supporting either of these claims, and

that even if she can, the Massachusetts recreational use

_____

[6] Indeed, the Beach Club stated that it would have been amenable
to revising the deadlines and or permitting a deposition, had
the plaintiff sought to confer with the Beach Club prior to
filing the motion to strike.  I must also note the irony in the
plaintiff's motion to strike founded on a failure to follow
timeliness rules when she herself failed to follow the local
rules requiring a moving party to confer before filing such a
motion.  Irony, however, is not the grounds for my denial of the
motion to strike.

[7] At the hearing in this matter, it appeared that the parties do
not, in any event, dispute that title to the rock rests with the
Commonwealth and consequently will not be an issue at trial.
Under the circumstances, I assume – and the record as a matter
of law supports – the proposition for purposes of this motion
that the Beach Club does not have title or right in the rock.

statute, G.L. c. 21, § 17C, protects the Beach Club from liability.

## A.    *Standard of Review*

The purpose of summary judgment practice is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (citation omitted).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A "genuine" dispute is one that, based on the supporting evidence, "a reasonable jury could resolve . . . in favor of the non-moving party," and a "material" fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted).  When reviewing a motion for summary judgment, I view the facts "in the light most favorable to the non-moving party." *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999).

If the moving party satisfies the burden of showing, based on evidentiary material, that there is no genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate by reference to specific provable facts "that a

reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See
Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).
"[C]onclusory allegations, improbable inferences, and
unsupported speculations" are insufficient to establish a
genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco
Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

**B.    *Duty of Care***

   1.  <u>Legal Standard</u>

   A negligence claim requires proof that the defendant owed a
legal duty to the plaintiff, that the defendant breached this
duty, and that the breach was the proximate cause of the
plaintiff's injury. *Jupin* v. *Kask*, 849 N.E.2d 829, 834-35
(Mass. 2006); *see Davis* v. *Westwood Grp.*, 652 N.E.2d 567, 569
(Mass. 1995). The first element, the existence of a legal duty,
is the primary issue raised by the parties at this stage and is
a question of law for the court, "to be determined by reference
to existing social values and customs and appropriate social
policy." *O'Sullivan* v. *Shaw*, 726 N.E.2d 951, 954 (Mass. 2000)
(citing *Davis*, 652 N.E.2d at 569; *Yakubowicz* v. *Paramount
Pictures Corp.*, 536 N.E.2d 1067, 1070 (Mass. 1989)).

   It is well-recognized that "an owner or possessor of land"
owes "to all lawful visitors" a duty of reasonable care that

"includes an obligation to maintain the premises in reasonably safe condition and to warn visitors of any unreasonable dangers of which the landowner is aware or reasonably should be aware." *Davis*, 652 N.E.2d at 569-70 (citations omitted); *see Mounsey* v. *Ellard*, 297 N.E.2d 43, 52-53 (Mass. 1973) (scope of duty determined "in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk").

Where a plaintiff claims injury from a dangerous condition, premises liability "depends upon [the defendant's] 'control of the offending instrumentality, either through ownership or otherwise.'" *Marsden* v. *Eastern Gas & Fuel Assocs.*, 385 N.E.2d 528, 530 (Mass. App. Ct. 1979) (citing *Frizzell* v. *Metropolitan Coal Co.*, 10 N.E.2d 115, 116 (Mass. 1937)); *see Hopkins* v. *F.W. Woolworth Co.*, 419 N.E.2d 302, 303 (Mass. App. Ct. 1989) ("the party in control of premises owes a duty to a lawful visitor to keep them in reasonably safe condition"). "[C]ontrol rather than legal ownership" is the central concern. *Marsden*, 385 N.E.2d at 530. (citations omitted). The guiding principle is that "[o]ne who assumes the control and management of property cannot escape liability for injuries by showing a want of title in himself." *Id.* (citations omitted).

The parties offer differing interpretations of what constitutes "control." The Beach Club asserts that a *legal right* to control the premises, such as through ownership, a lease or contract, or successful adverse possession, is required for the duty to attach. The plaintiff, in contrast, asserts that the *exercise* of control over the premises in question, whether pursuant to a legal right or not, determines whether a duty arises. The crux of the dispute, then, is whether in these circumstances, a commercial tenant can be said to control adjacent premises for which the tenant's property serves as a portal such that some duty of care to lawful visitors arises.

An express right to control the premises, conferred through the mechanisms of ownership, leasehold, contract or adverse possession, clearly gives rise to a duty of care. *See, e.g.*, *Humphrey* v. *Baron*, 850 N.E.2d 1044, 1050 (Mass. 2006) (commercial tenant controlled premises because premises expressly included in lease); *McIntyre* v. *Boston Redevelopment Auth.*, 595 N.E.2d 334, 335-36 (Mass. App. Ct. 1992) (defendant owner of public highway had right to control it); *Hopkins*, 419 N.E.2d at 304 (commercial tenant had duty to warn where landlord and tenant shared repair responsibilities). But the attachment of a duty of care to visitors is not necessarily limited to such arrangements.

17

Various compendia of nationwide case law reflect a common understanding that control of adjacent property, even absent a legal right, can in some circumstances confer a duty of care, as the plaintiff suggests. *See, e.g.*, 62 Am. Jur. 2d *Premises Liability* § 12 (2014) (property possessor can assume a duty of care as to adjacent property where property possessor has agreed to make safe a dangerous condition, has created a dangerous condition even if not in control of the premises, or has assumed actual control over a portion of the adjacent property despite lacking a legal right to control, or where there is an obscured danger on appurtenant land that is near a place where guests enter and exit the possessor's property); 65A C.J.S. *Negligence* §§ 410, 684 (2014) (reciting same scenarios). The Restatement (Third) of Torts defines a possessor of land as one "who occupies the land and controls it" and indicates that actual control of the property is the key inquiry. Restatement (Third) of Torts § 49, cmt. a, reporters' note to cmt. a (2012). Such control may be exercised by one who does not have legal title. *Id.* § 49, cmt. c. Where the touchstone of the attachment of a duty of care is control, see *Marsden*, 385 N.E.2d at 530, the Restatement suggests that possession absent a legal right to control can give rise to such a duty.

18

It appears that Massachusetts has adopted this understanding, at least to some extent. The Massachusetts Appeals Court has recognized that "in some situations a landowner's duty to exercise reasonable care does not terminate abruptly at the borders of his property but may extend to include a duty to take safety measures related to known dangers on adjacent property." *Gage* v. *City of Westfield*, 532 N.E.2d 62, 64 (Mass. App. Ct. 1988) (citing *Polak* v. *Whitney*, 487 N.E.2d 213, 215 (Mass. App. Ct. 1985)); *see Polak*, 487 N.E.2d at 215 ("The extension of the duty in appropriate circumstances to conditions on adjacent property derives from the same general obligation to act reasonably to protect one's invitees from the hazards of which the owner is aware"). Less clear, however, is how far and in what form the duty that Massachusetts recognizes will extend with respect to adjacent property.

2. Analysis

I turn now to the factual record, considered in the light most favorable to the plaintiff, to assess whether it could support a conclusion by a reasonable fact finder that the Beach Club exercised control in such a way that it owed some duty to visitors as to the rock.

The Beach Club contends, and the plaintiff does not deny, that there are no facts indicating that the Beach Club has a

legal right to control the rock. The Beach Club's expert has indicated that the rock sits beyond the recognized boundary line of the mean low tide mark and therefore is not part of the Beach Club's lease. *See Spillane*, 922 N.E.2d at 810-13. There is no evidence of any conveyance of any right to the rock to the Beach Club by the Commonwealth or any other entity purporting to hold title.[8]

The plaintiff contends, however, that there is evidence to create a material dispute as to whether the Beach Club exerted sufficient control over the rock to give rise to a duty. Specifically, the plaintiff asserts that the Beach Club both encouraged and prohibited use of the rock by guests through its roping arrangement, its flag system, the behavior of its lifeguards (including whistling in swimmers near the rock during dangerous conditions, allowing them to remain in calm conditions, and monitoring the area), and its signage purporting to impose rules for the use of the rock, and that this conduct involved exercising control over access to and use of the rock

---

[8] The Beach Club further asserts that it could not have adversely possessed the rock because such adverse possession is specifically prohibited by statute. *See* G.L. c. 260, § 31. The availability of a legal claim to the land through adverse possession, however, is not entirely dispositive where the analysis hinges on actual possession or control of the land. *See* Restatement (Third) of Torts § 49 cmt. c (2012); Restatement (Second) of Torts § 328E cmt. a (1965).

by visitors to the Beach Club.  The Beach Club does not deny that it exercised actual control over the rock but instead maintains that the *right* to control is critical to a finding of a duty.

In support of her argument, the plaintiff relies primarily on *O'Brien* v. *Peterson*, 108 N.E.2d 538, 539-40 (Mass. 1952).  In *O'Brien*, the plaintiff, a guest of a hotel owned by the defendant, was injured when she fell into a hole along a shoreline pathway adjacent to the hotel connecting it to an area with a shack and grill commonly used by hotel guests for "roasts."  *Id.* at 539.  The plaintiff had arranged with the hotel staff to conduct a roast that night and was on her way to the grill when she was injured.  *Id.*  The court concluded that whether the plaintiff was someone to whom the defendant owed a duty of care to keep the premises safe or to warn of dangers was a question for the jury, because there was evidence permitting the inference that "the oven was held out by the defendant as one of the facilities for the use and enjoyment of his paying guests, that he intended it to be used by his guests, and that the plaintiff was thereby induced to proceed to the oven and the place of her accident."  *Id.*  Although *O'Brien* is favorable to the plaintiff in theory, the case has been cited sparingly and cannot be said to have stated the standard for premises

liability through the exercise of control over adjacent

property.[9]

A more recent case, *Davis* v. *Westwood Group*, 652 N.E.2d 567

(Mass. 1993), has been recognized by Massachusetts courts as

indicating the current approach to this issue, albeit in a

fashion somewhat limited by its facts.  In *Davis*, the plaintiff

was injured when he was hit by a van while crossing a state

highway that separated the defendant's racetrack from its

parking lot.  *Id.* at 568.  Guests who parked in the lot would

assemble at a painted crosswalk and wait for a city police

officer hired by the defendant to stop traffic and direct guests

to cross.  *Id.* at 569.  The court noted that "a landowner or

possessor typically is not held to any duty with respect to

public highways adjacent to or crossing his land," but that "he

---

[9] *O'Brien* has been cited by the Massachusetts Supreme Judicial
Court and the Appeals Court only five times since it was handed
down in 1952: once for the proposition that a duty might arise
in similar circumstances, see *Greenslade* v. *Mohawk Park, Inc.*,
798 N.E.2d 336, 340 (Mass. App. Ct. 2003); twice as a
distinguishable case, see *Buck* v. *Clauson's Inn at Coonamessett,
Inc.*, 211 N.E.2d 349, 351 (Mass. 1965), and *Vance* v. *Wayside
Inn, Inc.*, 141 N.E.2d 365, 366 (Mass. 1957); and twice on the
issue of contributory negligence, see *Brogie* v. *Vogel*, 205
N.E.2d 234, 237 (Mass. 1965), and *Coan* v. *Adams*, 127 N.E.2d 198,
200 (Mass. 1955).  Perhaps more importantly, the *O'Brien* opinion
does not indicate whether the defendant owned or otherwise had a
legal right to use or control the adjacent pathway or the shack
and grill.  *See O'Brien* v. *Peterson*, 108 N.E.2d 538, 539-40
(Mass. 1952).

must exercise reasonable care in the use of his land so as not to injure a traveler on the highway." *Id.* at 570. The court rejected the plaintiff's assertion that the defendant had a "broad duty to provide safe passage over the State highway for guests," because even though the defendant exercised some control over that portion of the highway by hiring a police officer to assist with crossing, it did not have the right to make alterations to the highway that would provide safer passage. *Id.* at 570-71. Rather, this authority and control rested with the Commonwealth. *Id.* at 570-71.

The *Davis* court did determine that the defendant had voluntarily assumed "a duty to exercise due care in carrying out the particular task, that of hiring police officers to direct pedestrians across [the highway]." *Id.* at 571. Implicitly concluding that the defendant had not breached this duty as to the plaintiff, however, the court directed entry of a judgment in favor of the defendant. *Id.* at 572.

*Davis* suggests that a legal right to control is necessary in order for the law to impose a duty to *maintain* the premises in a reasonably safe manner. Otherwise, property possessors would be placed in the difficult position of being expected to alter property which they have no right to alter (and which, in the case of *Davis*, the Commonwealth had an affirmative duty to

maintain).  However, *Davis* does not preclude the imposition of
some independent duty where the defendant voluntarily assumes
the duty, exercises some amount of control over the adjacent
property, or has some awareness of dangers on the adjacent
property.  *See Gage*, 532 N.E.2d at 64; 65A C.J.S. *Negligence*
§§ 410, 684 (2014).

Here, there are facts supporting the conclusion that the
Beach Club voluntarily assumed some precautionary duties as to
the rock, including hiring lifeguards whose responsibilities may
have extended to the area surrounding the rock, implementing
roping and a flag system indicating when it was unsafe (and
perhaps, conversely, safe) to use the rock, and posting warning
signage regarding use of the rock.  In *Davis*, the court
recognized that the defendant had voluntarily assumed a duty of
care in hiring police officers – in other words, it had
voluntarily assumed a duty of taking a specific precaution
regarding visitors' use of adjacent property where the defendant
recognized some danger.  So too did the Beach Club undertake
some precautions to ensure the safety of its visitors when they
used the rock on the adjacent premises.[10]  A duty voluntarily
assumed, like one imposed by law, must be executed with

---

[10] The duty assumed by the Beach Club appears greater than that
assumed by the defendant in *Davis*.  In both cases, the

24

reasonable care. *See* Restatement (Second) of Torts § 323
(1965); *see also Great Northern Ins. Co.* v. *Paino Assocs.*, 364
F. Supp. 2d 7, 19 (D. Mass. 2005). A reasonable fact finder
could therefore conclude that the Beach Club had a duty to
execute its assumed duties with such care. The scope of these
duties would require "a fact-specific inquiry" by a jury.
*Cottam* v. *CVS Pharmacy*, 764 N.E.2d 814, 822 (Mass. 2002).

Even absent the voluntary assumption of a duty to keep
guests safe in using the rock, the facts supporting the Beach
Club's exercise of some actual control over the rock and the
Beach Club's knowledge that the rock posed some potential danger
suggest that the Beach Club could be found to owe a duty of care

---

defendants knew of and indeed facilitated the use by guests of
adjacent property that was owned by the Commonwealth but over
which the defendant exercised some limited control. In *Davis*,
the use of the adjacent premises was merely as a thoroughfare
from the parking lot to the racetrack. In contrast, in the
instant case, the Beach Club itself serves as an access point
for guests to use the rock during their visit to the Beach Club.
In addition, there are differences in use by the general public
that suggest that the extent of the Beach Club's ability to
control, and actual control over, the rock exceeded the control
exercised in *Davis*. Here, the use of the rock by guests of the
Beach Club is presumably greater than that of members of the
general public, since the Beach Club provides a point of access
from shore rather than by boat. In contrast, one can imagine a
variety of reasons why individuals not attending the racetrack
at issue in *Davis* might nonetheless use or cross the state
highway.

as to the rock.[11]  Indeed, prevailing social norms suggest that

where a recreational club holds out as a benefit of attendance a

myriad of beach and water-related activities, and where it can

be reasonably inferred that the club serves as a portal for

engaging in the activity of jumping off a nearby natural rock

formation whose name the Beach Club bears, the club has some

duty of care toward its guests regarding their use of the rock

for recreational purposes.[12]  *See O'Sullivan*, 726 N.E.2d at 954.

   As a matter of law, however, this duty cannot include a

duty to repair, to maintain, or to remedy dangerous conditions,

see *Davis*, 652 N.E.2d at 567-69, but it could consist of a duty

to warn guests of the dangers of using the rock.  *See Polak*, 487

---

[11] There is a genuine dispute as to whether the lifeguards had an awareness of dangers posed by an extension of the rock below the water's surface.  A reasonable fact finder, however, could infer from the Beach Club's posting of warning signs that the Beach Club perceived some danger in use of the rock for recreation.

[12] This exercise of control over the rock, among other factual distinctions, differentiates the instant case from *Jones* v. *Halekulani Hotel, Inc.*, 557 F.2d 1308, 1310-11 (9th Cir. 1977), a case relied on by the Beach Club.  In that case, the court affirmed the grant of summary judgment in favor of the defendant hotel on a premises liability claim because the frequent public use of a seawall on the defendant's property created a public easement by prescription.  *Id.* at 1310.  Because the defendant had not engaged in any "consistent, continuous activities" involving the seawall, and because this public easement had been established, the court concluded that the hotel had not "exerted such dominion over the wall and its users that there existed some duty on its part in respect to the protection of the appellant against his own act."  *Id.*

N.E.2d at 215 (property owner had duty "to act reasonably to protect [its] invitees from the hazards [on adjacent property] of which the owner [was] aware," and therefore could have duty to warn as to known hazards, because duty of reasonable care "did not end abruptly at the boundary line of the property over which [it] exercised control"); *Hopkins*, 419 N.E.2d at 304 (commercial tenant "had a duty to keep the premises used by its patrons in a reasonably safe condition and, at the least, to warn customers of any danger of which it knew or should have known. . . . Even if a finding were warranted that [the defendant] had no control over the sidewalk on which the plaintiff fell, it would not be relieved from its duty to warn its invitees of danger" (citation omitted)). *Compare Monterosso v. Gaudette*, 391 N.E.2d 948, 953, 953-54 (Mass. App. Ct. 1979) (one defendant had duty to maintain adjacent premises because lease granted him rights and repair responsibilities to that area, whereas other defendant did not have duty to maintain or to warn because lease granted her neither control nor right to use adjacent premises, and because she "did not use or possess" that area). In these circumstances, a reasonable jury could find that the Beach Club exercised sufficient control over the rock to give rise to some duty to warn its guests regarding the dangers associated with use of the rock. The plaintiff has

accordingly established that the essential element of a legal duty is "at least trialworthy." *Price* v. *General Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991).

## C.  *Duty to Warn*

### 1.  Legal Standard

Where a property possessor has a duty to warn, that duty applies to "any unreasonable dangers of which the landowner is aware or reasonably should be aware." *Davis*, 652 N.E.2d at 569-70.  However, "[l]andowners are relieved of the duty to warn of open and obvious dangers on their premises because it is not reasonably foreseeable that a visitor exercising (as the law presumes) reasonable care for his own safety would suffer injury from such blatant hazards." *O'Sullivan*, 726 N.E.2d at 954-55. Determining whether a danger is "open and obvious" entails an objective inquiry into what "would be obvious to a person of average intelligence, that is, a visitor with ordinary perception and judgment exercising reasonable care for his own safety." *Id.* at 956-57.

This "open and obvious" exception to the duty to warn is based on "the assumption that the warning provided by the open and obvious nature of the danger is by itself sufficient to relieve the property owner of its duty to protect visitors from dangerous conditions on the property." *Papadopoulos* v. *Target*

28

*Corp.*, 930 N.E.2d 142, 151 (Mass. 2010); *O'Sullivan*, 726 N.E.2d at 955 ("any further warning would be an empty form" (citation omitted)). The assumption is challenged, however, where a property owner "can and should anticipate that the dangerous condition will cause physical harm to the [lawful visitor] notwithstanding its known or obvious danger." *Id.* (quoting *Soederberg* v. *Concord Green Condominium Ass'n*, 921 N.E.2d 1020 (Mass. App. Ct. 2010)). Where such harm is anticipated or foreseeable, and where a property owner "has created and maintained that danger with the knowledge that lawful entrants would . . . choose to encounter it despite the obvious risk of doing so," the property owner has a duty to remedy the danger. *Dos Santos* v. *Coleta*, 987 N.E.2d 1187, 1189, 1192 (Mass. 2013).

2. Analysis

The parties do not dispute that the plaintiff, following the lead of other guests of the Beach Club, jumped off a natural rock formation into the ocean where the depth of the water and what was below the water's surface were not visible. Rather, they dispute whether this activity constituted an open and obvious danger under the circumstances.

The Beach Club contends that this activity is analogous to dangers that Massachusetts courts have previously recognized as being open and obvious. *See O'Sullivan*, 726 N.E.2d at 953, 956

("div[ing] headfirst into the shallow end of the defendants'
swimming pool" – which had no depth notations – at night posed
an open and obvious danger, and citing numerous cases in other
jurisdictions reaching same result); *Greenslade* v. *Mohawk Park,
Inc.*, 798 N.E.2d 336, 339 (Mass. App. Ct. 2003) ("person of
ordinary intelligence" would have reached "rational conclusion"
that "it is unsafe to swing on the end of a rope suspended over
water, heedless of the potential presence of rocks beneath the
water's surface or of the possibility that letting go of the
rope too late or too soon could result in a landing on the rocky
embankment," and citing other jurisdictions "that have concluded
that diving into a river from a cliff or from a rope swing"
presents an open and obvious danger); *see also Polak*, 487 N.E.2d
at 215 (danger of parking cars adjacent to highway "ought to
have been so obvious to the ordinary person" that host, who
owned adjacent property, "was not required to warn her guests of
that danger"); *Ogni* v. *Schlien*, 889 N.E.2d 450, *2 (Mass. App.
Ct. 2008) (table/unpublished opinion) ("traversing unfamiliar
terrain in complete darkness was an open and obvious danger").

The plaintiff contends that the danger posed by jumping off
the rock was not open and obvious because the source of the
danger lurked below the surface.  She asserts that the rocks
below the surface of the water could not be seen by guests, and

that the lifeguards knew that one needed a running start when jumping off the rock to clear these hidden below-surface rocks.[13] She further asserts that because she watched others jumping off the rock without a problem, she, and more importantly a person of ordinary intelligence, reasonably thought there was no danger in doing so.[14]

The specific facts which the plaintiff references raise a jury question regarding her contention that the danger was not open and obvious.  Although the Beach Club asks me to hold as a matter of law that jumping from the rock posed such a danger, this determination in these circumstances requires findings of fact regarding what a reasonable person of ordinary intelligence in the plaintiff's position would have considered to pose an obvious danger.  *See O'Sullivan*, 726 N.E.2d at 955.  That inquiry must be conducted in the first instance by a jury with a fully developed record in light of all of the facts surrounding the plaintiff's visit to the Beach Club and the nature of the rock itself.  *Cf. Cracchiolo* v. *Eastern Fisheries, Inc.*, 740 F.3d 64, 73 (1st Cir. 2014) (determining that premises liability

---

[13] The parties dispute whether the rock angles in a visibly outward direction as it descends to the water's surface.

[14] The plaintiff states that she watched both children and adults take a running start and jump off the rock, and that she employed the same technique in jumping.

case was "not suitable for resolution on summary judgment" because "record contain[ed] too many disputes of fact and too many disputed inferences," and raised questions of foreseeability to defendants of certain visitors engaging in dangerous conduct).

Some facts, of course, will be of minimal import in the objective analysis that the inquiry requires. For example, that the plaintiff or the lifeguards may have witnessed others successfully perform the maneuver does not necessarily save a danger from classification as open and obvious. *See O'Sullivan*, 726 N.E.2d at 953, 956 (plaintiff's observation of other swimmers diving into shallow end of pool by performing special type of dive did not render that activity any less of an open and obvious danger because fact "[t]hat many people might engage in objectively hazardous conduct on the basis of a belief that it can be done safely does not affect [the open and obvious] analysis"). Nor do any subjective perceptions by the plaintiff of the danger inform the result except as they might be treated by the jury as evidentiary of the perspective of the objectively conceived "reasonable person of ordinary intelligence in the plaintiff's position." Other facts, particularly those illuminating the objective perception a visitor to the Beach Club would have of the rock and the dangers that may result from

32

jumping off of it, will be determinative, and will be elicited through witness testimony and assessed by a reasonable fact finder. After hearing all the evidence, that fact finder could find that jumping from the rock formation did not pose an obvious danger.

The plaintiff's assertion that my opinion in *Godsoe* v. *Maple Park Properties, Inc.*, Civ. No. 06-10405, 2007 WL 2317468 (D. Mass. 2007), requires a ruling in her favor is overly optimistic. In *Godsoe*, a young boy was severely injured when he used an eight-and-a-half foot tall slide installed by the defendant in a man-made lake on the defendant's campground property. *Id.* at *2. The boy, who had been swimming in the lake before using the slide, could not see the bottom of the lake and did not know that the slide let out in a portion of the lake that was just two feet deep. *Id.* at *2. I concluded that there were two dangers that were not open and obvious to the plaintiff: the shallow depth of the lake at the point where the slide let out, and the allegedly defective slide apparatus (the slide did not have a hood or canopy at the top to channel the user into a sitting position or otherwise comply with safety standards for water slides). *Id.* at *2-5. This determination was based in part on the fact that there was no basis for the boy to believe that the depth would be so shallow at the end of

33

the slide or that the slide would be inherently unsafe where the slide was "installed by the Defendant in a man-make lake created specifically for the recreational purposes of campground guests." *Id.* at *4. Those conditions are in significant contrast to those of a natural rock formation along the Atlantic Ocean outside the bounds of the Beach Club's property line.

However, *Godsoe* does reflect an important general principle: a defendant may not maintain its property "in an unreasonably unsafe condition as long as the unsafe condition is open and obvious." *Id.* at *5 (citation omitted). That principle has been applied more recently by the Supreme Judicial Court in *Papadopoulous* and *Dos Santos*, which concluded that a property owner has a duty to remedy an open and obvious danger that poses a foreseeable risk of injury to a lawful visitor. *See Dos Santos*, 987 N.E.2d at 1189.

In *Dos Santos*, the Supreme Judicial Court noted that where a defendant creates a dangerous situation, such as by "set[ting] up [a] trampoline next to [a swimming] pool with the specific intent to enable the type of use that resulted in the plaintiff's injury," and where the defendant "knew that the trampoline and pool were in fact being used in this manner and that this use was dangerous," the defendant would be able to anticipate the risk of injury, despite the open and obvious

nature of the danger, and therefore had a duty to remedy the danger.  *Id.* at 1195-96.

The court adopted the Restatement (Second) of Torts § 343A & cmt. f (2014), which provides that in cases where "the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger . . . the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection.  This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm."  In so doing, the court distinguished *O'Sullivan* as a case in which "the only possible theory of liability was a negligent failure to warn," and "the negation of the duty to warn by operation of the open and obvious danger rule therefore negated any duty of care in that particular case."  *Dos Santos*, 987 N.E.2d at 1197.  In contrast, as to cases in which there is a duty of reasonable care at issue, *Dos Santos* suggests that the duty cannot be erased automatically simply because the danger was open and obvious to guests, if a defendant has intentionally created, encouraged, or facilitated the dangerous condition, rather than merely

maintaining property that contains a dangerous condition.
*Contrast Cracchiolo*, *Inc.*, 740 F.3d 72 (distinguishing *Dos Santos* because the landowner had not taken actions "to induce activity which foreseeably would cause injury").

There is a genuine dispute as to whether the rock here posed a foreseeable risk of physical harm to the Beach Club's guests, particularly where the Beach Club knew that guests of all ages regularly jumped off the rock and may be said to have known that the rock extended outward below the water's surface. *Cf. Cracchiolo*, 740 F.3d at 73-74. Were the rock located on the property leased by the Beach Club, this potentially foreseeable risk of harm would give rise to a duty to remedy the danger, even if it is an open and obvious one, under *Dos Santos*. But those are not the facts here.

Where, as here, "the only viable theory of negligence" is failure to warn, and not failure to remedy, the question of whether the danger was open and obvious is dispositive. *Cf. Matouk* v. *Marriott Hotel Servs., Inc.*, Civ. No. 11-12294, 2013 WL 6152333 (D. Mass. Nov. 21, 2013). *Contrast Dos Santos*, 987 N.E.2d at 1197. If it was open and obvious, the Beach Club had no duty to warn; if it was not, the question then becomes whether the Beach Club exercised that duty with reasonable care by providing adequate notice of the dangers associated with

jumping off the rock to its guests.  Because the plaintiff has identified specific facts of record that could enable a reasonable jury to find that the danger posed by the rock is not open and obvious, the Beach Club is not entitled to summary judgment.

Under the circumstances, the Beach Club may not be held to a duty to remedy dangerous conditions associated with the rock. As in *Davis*, the Beach Club lacks the legal right to control and make modifications to the adjacent premises where the danger is located.  However, although it cannot be held to a duty of care to maintain the premises in a reasonably safe condition, from which a duty to remedy arises, the Beach Club's plausible exercise of some control over access to the rock can be said to impose a duty to warn guests of the dangerous condition on the adjacent premises and take additional steps to restrict access to the rock by those using the Beach Club's own property.

## D.    *Recreational Use Statute*

### 1.  Legal Standard

The Massachusetts recreational use statute, G.L. c. 21, § 17C, "bars a recreational user's claim for ordinary negligence against a landowner who has opened his land to the public for 'recreational purposes.'" *Ali* v. *City of Boston*, 804 N.E.2d 927, 929 (Mass. 2004).  Section 17C(a) provides: "Any person

37

having an interest in land . . . who lawfully permits the public
to use such land for recreational . . . purposes without
imposing a charge or fee therefor . . . shall not be liable for
personal injuries or property damage sustained by such members
of the public . . . while on said land in the absence of wilful,
wanton, or reckless conduct by such person." The statute
expressly states that it does not serve to limit liability if
the landowner charges a fee for the use of the land by the
public. G.L. c. 71, § 17C(b). The Beach Club asserts the
application of the recreational use statute as an affirmative
defense to any alleged negligence and an alternative ground for
summary judgment.

2. Analysis

a. Interest in the Land. When addressing the question of
interest in the land under § 17C, the parties are in the awkward
position of offering arguments on a factual basis counter to
those that they assert on the underlying negligence claims. The
Beach Club contends that it has a sufficient interest in the
rock if it is deemed to owe a duty as to the rock because the
rock is considered part of the leased land. The plaintiff
contends that the Beach Club does not have a legal interest in
the rock and therefore cannot use this defense.

If the lease between the Beach Club and WHIC included the rock, or if the Beach Club had some other contractual right to use the rock, that might be sufficient. *See* G.L. c. 21, § 17C(b) ("'person' shall include the person having any interest in the land, [including] his agent, manager or licensee"); *Patterson* v. *Christ Church in Boston*, 6 N.E.3d 1099, 1101-03 & nn.4, 6-7 (Mass. App. Ct. 2014) (affirming that defendants, including foundation responsible for organizing tours of church at issue and nonprofit corporation that manages church and its use for worship, "have an interest in the church sufficient to warrant protection under the statute"). *But see Ali*, 804 N.E.2d at 930-31 (speaking in terms of "landowner liability"). It does not appear, however, that a duty under tort law as to adjacent property can be considered to create an interest in land as contemplated by the statute. Regardless of whether the Beach Club owes such a duty in tort as to the rock, there is no indication that it has a property interest in the rock.[15] Accordingly, this element is not satisfied.

*b. Open to the Public for Recreational Purposes Free of Charge.* It is undisputed that the Beach Club and the rock were

---

[15] The Beach Club's expert states that the rock is physically outside of the Beach Club's leasehold, which the plaintiff does not dispute. Neither party points to a Beach Club property interest in the rock arising through some other arrangement.

used for recreational purposes. *See Catanzarite* v. *City of Springfield*, 592 N.E.2d 752, 752-53 (Mass. App. Ct. 1992). However, the plaintiff has established a genuine dispute of material fact as to whether the Beach Club provided access to the rock openly to the public without a fee.

The Supreme Judicial Court recently affirmed that where access to the property is restricted to a subset of the public at the time of the injury, the recreational use statute cannot serve as an affirmative defense. *See Wilkins* v. *City of Haverhill*, 8 N.E.3d 753, 756 (Mass. 2014). Permitting the use of the defense in such circumstances "would expand the statutory immunity from negligence beyond that which the Legislature intended by granting such immunity whenever a landowner invites a group of people onto the landowner's property for a recreational or other listed activity free of charge."[16] *Id.* at 756.

_____

[16] In *Wilkins*, the court held that a public school that was open one evening solely to parents of enrolled students for the purpose of attending parent-teacher conferences did not qualify for the protection of the recreational use statute, because only a subset of the public was permitted to enter the school at the time. *Wilkins* v. *City of Haverhill*, 8 N.E.3d 753, 755-57 (Mass. 2014). The court also rejected application of the statute because the purpose of the parent's visit was not an enumerated activity within the contemplation of the statute. *See id.*

Here, there is no dispute that the Beach Club is a private club requiring membership and the payment of a fee for entrance by a guest. The plaintiff was injured at a time when the Beach Club was open and was there as a paid guest of a club member. Because access to the club was limited to a subset of the public (members and their guests) at the time of the plaintiff's injury, *Wilkins* and G.L. c. 71, § 17C(b) squarely preclude the club from invoking the statute for protection from liability.

The Beach Club attempts to salvage this defense by distinguishing between access to the club and use of the rock. It contends that the fee the plaintiff paid was to access the club and the activities therein, but that use of the rock was available free of charge. As support for this contention, the Beach Club points to testimony from several individuals stating that the rock is accessed and used (for free) by members of the public who approach by boat and do not pay to access the club.

The Beach Club's maneuvering is unpersuasive. In order to assert this defense with any success, the Beach Club would need to establish that the rock was part of its property interest (a burden which, as I have stated, the Beach Club has eschewed). Were it to establish this prerequisite, it would effectively conceptualize the rock and the club as separate entities: the club as a private facility requiring the payment of a fee, and

the rock a free, public facility ancillary to the club.  Such a concept distorts the intended purpose of the recreational use statute.

The cases the Beach Club cites do not support its proposition.  In *Marcus* v. *City of Newton*, 967 N.E.2d 140, 147-48 (Mass. 2012), for example, the plaintiff was injured by a falling tree during a softball game in which he was playing; he had paid a registration fee to join a softball league, which then paid the defendant city parks and recreation department for a permit to reserve a field for use by the league.  *Id.* at 142-43.  The court concluded that the plaintiff "was not participating in a recreational use of the city's property free of charge" because he had paid, albeit indirectly, to be able to use the field for a softball game at the time he was injured.  *Id.* at 146-47.  Similarly here, the plaintiff paid a fee to use the club and partake in the activities therein during the time of her visit.  If the territory of the club included the rock, then jumping off the rock is surely one of the activities contemplated by entrance to the club.  The language in *Marcus* stating that "the issue is whether the landowner charges a fee for the particular use to which the plaintiff puts the land" plainly was not intended to produce the detailed parsing in

which the Beach Club engages.[17]  *See Marcus*, 967 N.E.2d at 146.

A reasonable fact finder could not conclude that the

requirements that the property be open to the public and without

charge are satisfied here.

    3.  Conclusion

    It is clear that the Beach Club does not have the

recreational use statute available as an affirmative defense to

---

[17] Instead, this phrasing was likely meant to introduce the distinctions the court went on to make between *Marcus* and two earlier cases, *Seich* v. *Canton*, 686 N.E.2d 981, 982-83 (Mass. 1997), and *Whooley* v. *Commonwealth*, 783 N.E.2d 461, 462-63 (Mass. App. Ct. 2003), in which the plaintiffs were engaged in distinctly different uses of the land (i.e., watching a sporting event) than those for which fees by others had been paid (i.e., playing a sporting event).  The court noted that in those cases "the landowners permitted members of the public to use the recreational facilities at issue to attend and watch youth athletic games free of charge, and the plaintiffs in both cases were, in fact, using the facilities in question in such a manner at the time each was injured."  *Marcus* v. *City of Newton*, 967 N.E.2d 140, 146 (Mass. 2012).  *See Seich*, 686 N.E.2d at 982-83 (affirming summary judgment for defendant based on G.L. c. 21, § 17C, because plaintiff's free admission to watch daughter's basketball game was distinct from daughter's payment of registration fee to defray costs of basketball league, as any member of public could watch game free of charge as plaintiff did); *Wooley*, 783 N.E.2d at 462-63 (affirming summary judgment for defendant based on G.L. c. 21, § 17C, because plaintiff's free admission to watch grandson's hockey game was distinct from hockey team's rental of rink, as any member of public could watch game free of charge).  Here, the plaintiff herself paid a fee in order to use the club for the recreational activities available there, which reasonably include using the rock.  She is therefore more akin to the plaintiff in *Marcus* than to those in *Seich* and *Wooley*.

shield itself from liability at this or any other stage of the proceedings.

## IV. CONCLUSION

For the reasons set forth above, I DENY the motion to strike the supplemental expert report, Dkt. No. 18, and DENY the Beach Club's motion for summary judgment, Dkt. No. 20.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE